CHIEF JUSTICE TURNAGE
concurring in part and dissenting in part:
I concur with the majority opinion on Issue 2.1 respectfully dissent from the majority opinion on Issue 1.
The majority opinion reverses the District Court and remands this case for determination of the amount by which the Inyokern property appreciated during the parties’ marriage. The majority opinion concludes that the District Court’s findings of fact numbered 23 and 24, relating to the valuation of the Inyokern property, have no factual basis in the record and, therefore, are clearly erroneous.
With the exception of finding 23, in that the figure $103,000 should have been $105,000, findings 23 and 24 are not clearly erroneous.
A review of the record in this case is enlightening and clearly supports the findings of the District Court. The record consists of:
(1) Over 1200 pages of transcribed depositions and trial testimony;
(2) Over 70 exhibits introduced at trial;
(3) Over 94 pages of discovery documents;
(4) Two large district court files containing 122 separate filings of documents.
*270 The setting of this conjugal war commenced on June 8,1989, with the marriage of the parties and escalated commencing April 30,1991, when the petitioner Rick Maedje (Rick) filed for a dissolution of his marriage to Kim Maedje (Kim). This marital war has continued for nearly three years and may well continue much longer now that the majority has reversed the District Court.
From a review of this record, it is readily apparent that the special master who presided in this case exercised the highest standards of judicial conduct and patience. The special master was faced with a most complex and difficult trial that consumed many judicial hours, three substitutions of counsel and involved parties that, charitably speaking, were on many occasions difficult.
The property that the special master was required to consider in arriving at an equitable distribution of the marital estate consisted of many items of personal property too numerous to mention and six parcels of real estate located in California and Montana, each of which had a substantial value that needed to be determined.
The majority of this Court reverses and remands this case, thereby prolonging the marital conflict for an indefinite period of time. The sole reason is the majority’s conclusion that there is no factual basis in the record to support the master’s findings of a value, as of June 8, 1989 (the date of the parties’ marriage), for a parcel of land of approximately twenty acres located in Kern County, California, and the amount of its appreciation during the marriage of the parties. This Court is asking a new trier of fact to perform an impossible task in trying to establish a value for this parcel of land nearly five years after the marriage.
It is apparent from the record that Rick was determined to avoid testifying concerning the value of the Inyokem property as well as to values of other property to be considered in the marital estate. An example of Rick’s avoidance of offering evidence of values of properties is his response to an August 13,1991 order of the court requiring the parties to set forth an inventory of the property involved in the marital estate and the values thereof. By Document 37 in the District Court file, Rick’s response states an inventory of all property owned by the parties jointly or separately. Rick lists eighty-three separate items of property, including the Inyokern property, and states for his response to the court that the value of each of the said eighty-three items is to him “unknown.”
The special master’s Conclusion of Law No. 6 states: “The value of the gross marital estate is approximately $520,385. The debt against *271 this estate is approximately $167,000, resulting in a net marital estate of $353,385.”
The special master in Conclusion of Law No. 9 stated that the value of the Inyokem property increased approximately $29,000 from the date of marriage to the date of sale and that the parties should share equally in the $29,000 increase in value. Therefore, the special master awarded $14,500 of the increase to Kim. The majority of this Court now finds that there is nothing in the record to substantiate this conclusion of law. I disagree.
There is no dispute in the record that the Inyokem property sold on March 26,1990, for $125,000; $55,500 was paid as a down payment and the balance of $69,500 was received by Rick in the form of a note and deed of trust. Rick’s Exhibit l-B-4.
Transcript Volume III, Page 50, sets forth Rick’s testimony on direct examination concerning this sale:
Q. So then in 1990 did you sell the Inyokem property?
A. Yes.
Q. Okay. And when did you put it on the market?
A. It was in the early winter, I believe.
Q. Okay. And it sold March 26,1990?
A. Yes.
Q. And about how much did you receive? How much did you receive for it?
A. The selling price was 125,000.
This testimony not only sets forth the sale of the property for $125,000 on March 26,1990, but also provides testimony from the owner of the property upon which the court can draw a lawful inference that this property was placed on the market in the early winter of 1989-90. Therefore, by inference in October 1989, some four months after the marriage, Rick must have placed a value of at least $125,000 on this property because it sold for that sum in March of 1990. Most certainly the buyer did not offer to pay more than the asking price. From this sale, Rick has been receiving $736 a month on the unpaid balance. (Transcript Volume III, Page 162.)
Rick’s Exhibit 9 establishes that he had agreed to sell the Inyokern property for $105,000 in 1983 but that the sale failed in 1985. Transcript Volume V, Page 136, sets forth the question directed to Rick by the court and his response. This portion of the transcript tells us that Rick did at this time put a value on Inyokern and the value *272 was $105,000. Undoubtedly the court’s erroneous figure of $103,000 in its findings should have been $105,000.
Rick’s testimony establishes that he therefore did put a value on that property which the court could use as an inference of value when he had offered no other assistance to the court in providing a June 8, 1989 value. In response to a question from the court, Rick testified, Transcript Volume V, Page 136:
Q. Can you tell me the value of the Inyokern property as of June 1989?
A. The only thing I can go on there is I had sold ten acres of it with the main barns and the corrals and arena and mobile on it for 105,000 to Lloyd and Beverly Hacker (phon.) in 1983 and that’s the only value that I could put on it. [Emphasis added.] [Note that this is the sale which failed.]
Kim testified as to a value of the Inyokern property, a value that she had obtained from Rick, the owner of the property. This testimony and the testimony of Rick provides substantial credible evidence upon which the court arrived at a value of the Inyokern property and the increase in value during the marriage. This evidence supports the court’s findings 23 and 24 whereby the court averaged the $90,000 value given by Kim with the testimony given by Rick that the value was $103,000 [sic] and subtracted that amount from the $125,000 sale price, arriving at an increase in value of $29,000.
Kim testified on direct examination concerning the value of the Inyokern property, Transcript Volume IV, Pages 153-55:
Q. Okay. And in June of ‘89 did Rick tell you what he thought it was worth?
A. Yeah, approximately.
Q. And how much was that?
A. Approximately 85 to 90,000 is what we thought it would sell for. Both of us. It was both of our impression that it would be right around that, that that would be its selling price, once it was —
Q. Was it then sold in April of 1990?
A. Uh-huh.
Q. And do you know how much it was sold for?
A. I believe it was 125.1 think that this is wrong, the 120. That should be —
Q. Sold for 120 to 125,000?
*273 A. Yeah.
Q. Okay.
A. I think we put the low ends on — both 85 and 120 here. It looks that way to me.
Q. Okay. Assuming it was sold for $90,000 — or excuse me, it was valued at $90,000 by Rick in June of ‘89 and then sold for 125,000 in 1990, March, what sort of an increase in value would that give us?
A. Well, it would be 35, and then split in half, it is 17,5.
Q. Okay, but you said that it was valued at 90,000 by Rick, not 85?
A. Well, it was speculation on our part. We thought 85 to 90 and that’s how I feel about it. It is hard when you are not real estate agents, and we are not even talking about an appraisal here. We are talking about two people talking.
MR. NEWCOMER: Your Honor, I would object to this line of questioning as simply eliciting speculation as to value.
THE COURT: I think she has been asked and answered this same question.
MR. LEITCH: I think so, too. I am responding to the objection. I think it is an admission against interest and I think under the Rules of Evidence it comes under what he valued the property at at that time.
THE COURT: Well, I will overrule the objection, but move on, because I think that information is in.
The record in this case is not a perfect example of how property should be valued and appraised; however, it does provide the court a substantial credible record upon which to base the findings of fact and the conclusions of law. It must be remembered that the court is responsible for providing an equitable distribution of the marital estate, and such was accomplished in this case. This case will soon be three years in duration. It has consumed countless hours of court time, involved five different lawyers resulting from three substitutions of counsel, and attorney liens filed against both Rick and Kim.
The amount involved in this case in view of the totality of the property is minimal. The court’s erroneous finding of $103,000 as the value set in Rick’s testimony when the value should have been $105,000, is of a trivial nature when viewed in light of the significant amounts of property in this case and therefore does not warrant any *274 remand or reversal on that point. Areversal and remand undoubtedly will result in prolonged District Court litigation and, in all probability, further appeal to this Court. The time has now arrived to bring to a conclusion the marital war between Rick and Kim. I would affirm the District Court.
JUSTICE NELSON concurs with the concurring and dissenting opinion of Chief Justice Turnage.
JUSTICE GRAY concurs with the concurring and dissenting opinion of Chief Justice Turnage.